ORDERED.

**Dated:  March 27, 2018**

Michael G. Williamson
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                    Case No. 8:16-bk-06552-MGW
                                                          Chapter 11
ICMfg & Associates, Inc.,

       Debtor.

_____/

ICMfg & Associates, Inc.,                                 Adv. No. 8:17-ap-00299-MGW

       Plaintiff,

v.

The Bare Board Group, Inc.

       Defendant/
       Removed Counter-Plaintiff,

v.

ICMfg & Associates, Inc., Michael
Doyle, Thomas Coghlan, and
Bonnie del Grosso,

       Plaintiffs/
       Removed Counter-Defendants.

_____/

## FINDINGS OF FACT AND
## CONCLUSIONS OF LAW ON LOST PROFITS

The Bare Board Group, which distributes printed circuit boards, seeks to recover $3.1 million in lost profits from two former directors (Tom Coghlan and Bonnie del Grosso), as well as a competing printed circuit board distributor they helped set up. Bare Board contends Coghlan and del Grosso caused the lost profits by transferring relationships they had with Bare Board customers to the new entity. Based on the evidence presented at trial, however, the Court is not persuaded that a prudent impartial person would be satisfied that Coghlan and del Grosso caused Bare Board's lost profits. And even if it had proved causation, Bare Board still failed to prove there was a reasonable "yardstick" for adequately determining the amount of lost profits. Because its lost profits claim is speculative and conjectural, Bare Board is not entitled to recover its lost profits.

## FINDINGS OF FACT

Bare Board is a typical printed circuit board distributor. Printed circuit boards, or PCBs, are the foundation for nearly all electronic equipment.[1] PCB distributors primarily sell to contract manufacturers, who take printed circuit boards and populate them with components before sending them down the supply chain.[2] PCBs are commodities: There are literally thousands of PCB distributors.[3]

---

[1] 10/23/17 Trial Tr., p. 61, ll. 21 – 24.

[2] *Id.* at p. 61, l. 25 – p. 62, l. 6.

[3] 10/24/17 Trial Tr., p. 186, ll. 17 – 20; p. 187, l. 24 – p. 188, l. 1.

PCB distributors typically buy boards from suppliers—often located in Asia—and then resell them to customers at a markup.[4] Most PCB distributors rely on outside sales representatives to identify prospective customers.[5] Outside sales reps, who ordinarily work on commissions, generally are not subject to noncompete or nonsolicitation agreements.[6] In fact, outside sales reps commonly represent—or sell boards—for multiple PCB distributors.[7]

PCB distributors generally don't have contracts with their customers.[8] Instead, sales typically begin with a request for quote.[9] Customers typically request quotes from multiple PCB distributors.[10] Whether a client chooses to go with a particular quote depends on several factors. Naturally, price is important.[11] So too are lead times.[12] And some customers like to do business with several PCB distributors to

---

[4] *Id.* at p. 187, ll. 12 – 19.

[5] Debtor's Ex. 94, p. 31, ll. 12 – 14; p. 32, ll. 7 – 12.

[6] 10/23/17 Trial Tr., p. 70, ll. 1 – 3; 10/24/17 Trial Tr., p. 151, ll. 12 – 17.

[7] Debtor's Ex. 94, p. 34, ll. 3 – 9; Debtor's Ex. 52, p. 154, ll. 9 – 11; p. 160, ll. 6 – 10; Debtor's Ex. 57, p. 90, ll. 20 – 25.

[8] 10/23/17 Trial Tr., p. 94, ll. 16 – 18.

[9] 10/24/17 Trial Tr., p. 193, ll. 3 – 18; p. 193, l. 24 – p. 194, l. 6; p. 196, ll. 5 – 10; 10/25/17 Trial Tr., p. 16, l. 20 – p. 18, l. 24; p. 31, l. 17 – p. 32, l. 6; p. 87, ll. 10 – 20.

[10] 10/24/17 Trial Tr., p. 193, l. 3 – 18; p. 193, l. 24 – p. 194, l. 6; p. 196, 5 – 10.

[11] 10/25/17 Trial Tr., p. 18, ll. 1 – 4; p. 89, ll. 2 – 9.

[12] *Id.*

ensure they receive competitive bids.[13] Customers also tend to follow their outside sales representative.[14]

In 2002, Greg Papandrew founded Bare Board. Previously, Papandrew worked at Universal Sales, another PCB distributor, along with Tom Coghlan and Bonnie del Grosso. When Papandrew founded Bare Board, he convinced Coghlan and del Grosso to join him. Papandrew gave Coghlan and del Grosso each a one percent interest in the company, and eventually the two became directors.

Coghlan was initially hired to handle inside sales for Bare Board, but he quickly became the company's operations manager. Still, he retained some sales responsibilities. Del Grosso was nominally Bare Board's sales manager, although in reality Papandrew was in charge of sales. Like most PCB distributors, Bare Board also relied on outsides sales representatives to sell its boards, including Jay Helms and Carl Moehring.[15]

In 2009, Mike Doyle, who had worked in the PCB industry for more than 30 years, decided to create a new PCB distributor: ICMfg & Associates (the "Debtor").[16] But Doyle didn't have sufficient credit to fund the Debtor's start-up

---

[13] *Id.* at p. 16, l. 20 – p. 18, l. 24; p. 31, l. 17 – p. 32, l. 6.

[14] Bare Board Ex. 127, p. 9 – p. 160, l. 1.

[15] 10/23/17 Trial Tr., p. 68, l. 20 – p. 69, l. 9. Bare Board also has an inside sales team. Once Bare Board lands the customer, the customer is serviced by the inside sales representatives. *Id.* at p. 69, ll. 15 – 22. But if there are future sales opportunities, the outside sales representatives are supposed to be the first line of communication. *Id.* at p. 69, ll. 15 – 22.

[16] 10/24/17 Trial Tr., p. 181, l. 24 – p. 184, l. 8.

costs.[17] So Doyle approached Coghlan, who was still a Bare Board employee and director at the time.[18]

Coghlan advised Doyle that it would take around $100,000 to fund the new entity. Coghlan agreed to invest $30,000 toward the start-up costs.[19] Coghlan also persuaded del Grosso, who was still with Bare Board, to invest $30,000 in the Debtor.[20] A third Bare Board employee, Katharine Hsu, invested $30,000, as well.[21] In exchange for their investment, Coghlan and del Grosso each received an ownership interest in the Debtor.

In addition to helping fund the Debtor's start-up costs, Coghlan and del Grosso, while still working for Bare Board, helped with the new company's operations: Coghlan and del Grosso opened the company's bank account,[22] bought furniture and computers,[23] and hired an accountant.[24] Del Grosso also served as the

---

[17] Bare Board Ex. 123, p. 62, ll. 1 – 12; Bare Board Ex. 133, p. 164, ll. 5 – 8.

[18] Bare Board Ex. 119, p. 31, ll. 4 – 8; p. 59, ll. 4 – 10; p. 64, l. 4 – p. 65, l. 7; Bare Board Ex. 131, p. 122, ll. 22 – 24; Bare Board Ex. 132, p. 156, ll. 9 – 13; Bare Board Ex. 123, p. 62, ll. 1 – 12; Bare Board Ex. 133, p. 165, ll. 6 – 14; Bare Board Ex. 119, p. 68, ll. 13 – 18; p. 84, l. 15 – p. 85, l. 11.

[19] Bare Board Ex. 131, p. 119, l. 16 – p. 121, l. 3; Bare Board Ex. 123, p. 61, l. 16 – p. 62, l. 12; p. 104, l. 24 – p. 105, l. 17.

[20] Bare Board Ex. 131, p. 119, l. 16 – p. 121, l. 3; Bare Board Ex. 123, p. 61, l. 16 – p. 62, l. 12; p. 104, l. 24 – p. 105, l. 17.

[21] Bare Board Ex. 131, p. 119, l. 16 – p. 121, l. 3; Bare Board Ex. 123, p. 61, l. 16 – p. 62, l. 12; p. 104, l. 24 – p. 105, l. 17.

[22] Bare Board Ex. 132, p. 151, l. 18 – p. 152, l. 1; Bare Board Ex. 131, p. 130, ll. 3 – 6; Bare Board Ex. 14.

[23] Bare Board Ex. 122, p. 78, ll. 1 – 11; p. 80, ll. 4 – 15; Bare Board Ex. 131, p. 129, ll. 19 – 22.

[24] Bare Board Ex. 132, p. 155, ll. 16 – 24; Bare Board Ex. 131, p. 135, ll. 6 – 11; p. 135, ll. 17 – 23.

Debtor's bookkeeper, handled accounts receivable and payable, and communicated with customers, suppliers, and sales representatives, while Coghlan helped with sales.[25]

In 2010 and 2011, the Debtor sold a little more than $1.5 million in printed circuit boards to eleven customers who had done business with Bare Board. One of those customers was Static Control, which had been one of Coghlan's customers when he was at Bare Board. While still working for Bare Board, Coghlan helped the Debtor get business from Static Control. Static Control accounted for almost half the Debtor's sales in 2010 and 2011.

In January 2012, Coghlan and del Grosso resigned from Bare Board and went to work for the Debtor. Since 2012, the Debtor has sold more than $24 million in printed circuit boards to forty-two customers who had at some point done business with Bare Board.[26] Had Bare Board made those $24 million in sales, it would have earned nearly $3.1 million in lost profits from those sales.[27]

Bare Board now seeks to recover those lost profits from Coghlan, del Grosso, Doyle, and the Debtor. Bare Board originally sued Coghlan and del Grosso for breach of fiduciary duty and fraud; the Debtor and Doyle for aiding and abetting Coghlan and del Grosso's breach of fiduciary duty; and all them for civil conspiracy and violation of Florida's Deceptive and Unfair Trade Practices Act. Bare Board's

---

[25] Bare Board Ex. 132, p. 152, l. 2 – p. 153, l. 4.

[26] Bare Board Exs. 87, 90 & 92.

[27] Bare Board Ex. 87.

claims all hinged on its allegation that Coghlan and del Grosso, while serving as Bare Board directors, diverted Bare Board customers to the Debtor.

The state court entered a default against Coghlan, del Grosso, Doyle, and the Debtor as a sanction for discovery violations. Because the default established liability for breach of fiduciary duty, fraud, aiding and abetting, civil conspiracy, and FDUTPA violations, the parties went to trial only on damages. At trial, Bare Board sought (among other damages) more than $3 million in lost profits from customers who were diverted to the Debtor.

The state court awarded Bare Board $3.9 million in lost profits for the diverted customers. The state court also required Coghlan and del Grosso to disgorge more than $1.4 million in salaries and bonuses. And it imposed $100,000 in punitive damages against each Coghlan and del Grosso. On appeal, the Second District Court of Appeal reversed the lost profit award and remanded the case back to state court.[28]

In the meantime, the Debtor filed for bankruptcy. The Debtor then removed the state court case to this Court. This Court held a four-day trial on lost profits. At trial, Bare Board offered the expert testimony of Steven Oscher, who opined that Bare Board was entitled to nearly $3.1 million in lost profits. According to Mr. Oscher, Coghlan and del Grosso caused Bare Board's lost profits by improperly transferring their relationships with Bare Board customers to the Debtor. The Court must now decide the amount of lost profits, if any, that Bare Board is entitled to.

---

[28] *ICMfg & Associates, Inc. v. Bare Board Group, Inc.*, 2017 WL 1040742, at *10 (Fla. 2d DCA March 17, 2017).

## CONCLUSIONS OF LAW

The starting point for this Court's lost profits analysis is the Second District Court of Appeal's decision. The Second DCA reversed the trial court's lost profits award because the trial court erroneously concluded that the default as to liability established causation.[29] The trial court based its lost profits award entirely on the expert testimony of Mr. Oscher. Mr. Oscher, however, "disclaimed any effort to investigate or to consider a link between [the defendants'] conduct and its effect on [Bare Board's] business."[30] According to the Second DCA, the trial court should not have granted Bare Board "a blank check on which it could insert the numbers it chose untethered to any link to the effects of [the defendants'] conduct."[31]

In other words, even though Bare Board obtained a default as to liability, it was still "obligated to prove some connexity between the damages claimed and the defendant's tortious conduct."[32] And it was required to prove that connexity—or causal connection—with a reasonable degree of certainty:

> Lost profits must be proven with a reasonable degree of certainty before the loss is recoverable. The mind of a prudent impartial person should be satisfied that the damages are not the result of speculation or conjecture.[33]

---

[29] *Id.* at *8.

[30] *Id.*

[31] *Id.* at *9.

[32] *Id.* (quoting *Rucker v. Garlock, Inc.*, 672 So. 2d 100, 102 (Fla. 3d DCA 1996)) (cleaned up). This order uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See, e.g., United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017).

[33] *ICMfg & Associates*, 2017 WL 1040742, at *8 (cleaned up).

Bare Board need not show that the Defendants' tortious conduct was the sole cause of its lost profits. But it must show, at a minimum, that the Defendants' conduct was a "substantial factor" in causing the lost profits.[34] Once it proved causation with some reasonable degree of certainty, then Bare Board was required to prove that there is some standard for adequately determining the amount of lost profits.[35]

**Bare Board failed to prove causation
with a reasonable degree of certainty.**

To meet its burden on causation, Bare Board again offered Mr. Oscher as its lost profits expert. And Mr. Oscher's opinion at trial was essentially the same as he offered in state court. In fact, Mr. Oscher's lost profits calculation did not change as a result of the Second DCA's ruling:

> Q:     Okay. So let me just summarize. As a result of the
>        Second DCA opinion, there's not one change to the
>        calculations of the damages arising from the taken
>        group, correct?
>
> A:     There is not a change; that's correct, sir.[36]

To determine Bare Board's lost profits, Mr. Oscher reviewed a list of customers that the Debtor sold printed circuit boards to between 2010 and 2017.[37] If

---

[34] *Arizona Chem. Co., LLC v. Mohawk Indus., Inc.*, 193 So. 3d 95, 103 (Fla. 1st DCA 2016); *Murphy v. Sarasota Ostrich Farm/Ranch, Inc.*, 875 So. 2d 767, 769 (Fla. 2d DCA 2004); *Cedar Hills Props. Corp. v. E. Fed. Corp.*, 575 So. 2d 673, 678 (Fla. 1st DCA 1991).

[35] *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1213 (11th Cir. 2006).

[36] 10/24/17 Trial Tr., p. 44, ll. 9 – 14.

[37] 10/23/17 Trial Tr., p. 150, l. 25 – p. 152, l. 11.

any of those customers had ever done business with Bare Board in the past, then Mr. Oscher ascribed all the profits from any sales to those customers to Bare Board using Bare Board's historical year-by-year profit percentage.[38] In all, Mr. Oscher opined that Bare Board was entitled to recover nearly $3.1 million in lost profits from sales to forty-two customers that had previously done business with Bare Board.[39]

Although Mr. Oscher is certainly qualified by his knowledge, skill, experience, training, and education to give opinion testimony, the Court did not find his testimony on causation at all persuasive. For starters, Mr. Oscher failed to link most of the lost profits to any wrongful conduct by the Defendants. Moreover, Mr. Oscher's opinion that Coghlan and del Grosso transferred their customer relationships to the Debtor is largely *ipse dixit*:[40] It happened because Mr. Oscher said it did. Finally, Mr. Oscher's testimony that the primary reason customers began doing business with the Debtor was because of their relationship with Coghlan and del Grosso (rather than price, lead times, or other factors) simply wasn't credible. The Court therefore concludes that Bare Board failed to meet its burden on causation.

*Mr. Oscher failed to link the $3.1 million in*

---

[38] *Id.* at p. 150, l. 25 – p. 152, l. 11; p. 155, ll. 7 – 10.

[39] *Id.* at p. 150, l. 25 – p. 152, l. 11; Bare Board Ex. 87.

[40] "Ipse dixit" is Latin for "he himself said it." Black's Law Dictionary 833 (7th ed. 1999). The term is used to refer to "[s]omething asserted but not proved." *Id.* In *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999), the Supreme Court held that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

*lost profits to the Defendants' wrongful conduct.*

The Second DCA was unequivocal that there must be a causal connection between Bare Board's lost profits and the Defendants' *tortious* conduct.[41] Here, Mr. Oscher opined that Coghlan and del Grosso caused Bare Board's lost profits by transferring relationships they had with Bare Board customers to the Debtor.[42]

But of the forty-two customers the Debtor sold printed circuit boards to, only eleven bought from the Debtor while Coghlan and del Grosso were stilled employed by Bare Board.[43] Accepting Mr. Oscher's testimony that Coghlan and del Grosso transferred customer relationships to the Debtor, it would appear they mostly did so after they resigned. After all, thirty-one of the forty-two customers did not begin buying from the Debtor until after Coghlan and del Grosso resigned. To the extent Coghlan and del Grosso transferred customer relationships after they resigned, that conduct is not wrongful and therefore cannot be the cause of Bare Board's lost profits.[44]

Under Florida law, there is nothing wrong with a former director using knowledge gained during his employment to compete with his former employer after

---

[41] *ICMfg & Associates, Inc. v. Bare Board Group, Inc.*, 2017 WL 1040742, at *1 (Fla. 2d DCA March 17, 2017).

[42] 10/23/17 Trial Tr., p. 155, ll. 15 – 22.

[43] Bare Board Ex. 87; Debtor's Ex. 1.

[44] *Renpak, Inc. v. Oppenheimer*, 104 So. 2d 642, 644 (Fla. 2d DCA 1958).

severing his relationship with his former employer.[45] Once a director severs his relationship with a company, the director no longer "occupies [a] relation to the corporation of trust or confidence and deals with it thereafter like any other stranger."[46] And skill and knowledge gained by an employee during his employment, including names of customers, "become part of his own mental equipment," and "[i]t is impossible to leave them behind so long as they exist in the mind of the employee."[47] In short, absent a restrictive covenant, neither Coghlan nor del Grosso were precluded from engaging in a competing business using knowledge they gained while at Bare Board once they resigned.[48]

In fact, Bare Board concedes as much. In its proposed findings of fact and conclusions of law, Bare Board concedes that Doyle could have created the Debtor and that Coghlan and del Grosso could have resigned and joined him.[49] Because neither Coghlan nor del Grosso were bound by a noncompete, nonsolicitation agreement, or confidentiality agreement, it would only have been wrongful for them to compete with Bare Board had they used Bare Board's trade secrets. But other than vague references to "confidential information," Bare Board doesn't contend they did. It appears, then, that the only wrongful conduct was Coghlan and del Grosso

---

[45] *Id.*

[46] *Id.*

[47] *Id.* at 645.

[48] *Id.* at 644.

[49] Adv. Doc. No. 108 at 2.

"transferring customer relationships" from Bare Board to the Debtor while Coghlan and del Grosso were still working for Bare Board.

If Coghlan and del Grosso transferred any relationships at all during that period, it would have only been for eleven customers. According to Mr. Oscher's analysis, the lost profits from the sales to those eleven customers in 2010 and 2011, the period when Coghlan and del Grosso were still working for Bare Board, was $176,877.[50] Even if you took the profits from all sales to those eleven customers between 2010 and 2017, the loss period used by Mr. Oscher, the lost profits for those eleven customers total just over $1.4 million,[51] which means Mr. Oscher failed to link $1.7 million of the $3.1 million in lost profits to any wrongful conduct.

In fairness, there is some evidence that Coghlan arguably "transferred his relationships" with two Bare Board customers who didn't start buying from the Debtor until after Coghlan left Bare Board. Specifically, Coghlan helped the Debtor bid on work for TE Connectivity ("Tyco") and General Microcircuits in 2011.[52] But those customers didn't begin buying from the Debtor until 2012.[53] Overall, Tyco and

---

[50] Bare Board Ex. 87.

[51] *Id.*

[52] Exs. 24, 44, 46, 47, 51, 52, 58, 59, 61, 62, 68, 70 & 73; Bare Board Ex. 127, p. 141, ll. 16 – 21; p. 143, ll. 16 – 20; p. 143, l. 24 – p. 144, l. 1; p. 144, l. 23 – p. 146, l. 14; p. 147, ll. 12 – 22.

[53] Bare Board Ex. 87.

General Microcircuits did nearly $2.7 million in sales with the Debtor between 2010 and 2017, which would have generated around $300,000 in lost profits.[54]

Even if you add the $300,000 or so in lost profits from those sales to the lost profits from the other eleven customers, that is still only $1.7 million in lost profits that can conceivably be linked to the Defendants' wrongful conduct. So even under Bare Board's best-case scenario, Mr. Oscher failed to link about $1.4 million—of the $3.1 million in lost profits—to the Defendants' wrongful conduct.

*Mr. Oscher's opinion was not based on facts and data.*

The threshold requirement for the admissibility of opinion testimony under Rule 702—once it's established that a witness is qualified and that the expert testimony will help the trier of fact understand the evidence or determine a factual dispute—is threefold: First, the testimony must be based on sufficient facts or data. Second, the testimony must be the product of reliable principles and methods. Third, the expert must have reliably applied the principles and methods to the facts of the case.[55] Of those three, the first is the most important.[56] Simply put, the ipse dixit of the expert is not enough.[57]

Yet that is, for the most part, all we have here. Mr. Oscher's lost profits analysis is primarily predicated on his opinion that Coghlan and del Grosso

---

[54] *Id.*

[55] *In re J.C. Householder Land Trust #1*, 501 B.R. 441, 454 (Bankr. M.D. Fla. 2013) (Williamson, C.J.).

[56] *Id.*

[57] *Id.* (explaining that "[t]he simple *ipse dixit* of the expert is not enough").

transferred their relationships with Bare Board customers to the Debtor. What facts or data support his opinion that Coghlan or del Grosso had relationships with any of the forty-two Bare Board customers at issue?

There was some evidence that Coghlan had relationships with five Bare Board customers: Static Control, Pacific Insight, Universal Electronics, Precision Graphics, and a fifth customer Coghlan couldn't recall.[58] There were also e-mail exchanges showing Coghlan and del Gross were involved with quotes for two customers (other than Static Control) while at Bare Board: Tyco and General Microcircuits.[59] In all, then, there was evidence Coghlan and del Grosso had some "relationship" with seven (or one-sixth) of the forty-two customers on Mr. Oscher's lost profits analysis. The only basis for concluding that Coghlan or del Grosso had a relationship with the remaining thirty-five customers is because Mr. Oscher says they did.

And what about evidence showing that any of those thirty-five customers later did business with the Debtor because of their supposed relationship with Coghlan and del Grosso? There is none. Mr. Oscher simply assumed that was the case and then set out to determine if any other reason for doing business with the Debtor outweighed the importance of the customers' relationships with Coghlan and del Grosso.[60] In that respect, Mr. Oscher's opinion simply begs the question: it assumes the very fact this Court must decide.

---

[58] Bare Board Ex. 119, p. 20, l. 15 – p. 21, l. 11.

[59] Exs. 24, 44, 46, 47, 51, 52, 58, 59, 61, 62, 68, 70 & 73.

[60] 10/24/17 Trial Tr., p. 66, l. 14 – p. 67, l. 8.

It is worth noting on this point that it's not clear what investigation Mr. Oscher performed in reaching that assumption. During his direct examination, Mr. Oscher testified he investigated the allegations against the Defendants.[61] On cross-examination, Mr. Oscher appeared to clarify that his investigation was the same as the one he had done before in the state court case.[62] But the Second DCA noted in its opinion that Mr. Oscher never investigated any causal connection between the Defendants' conduct and Bare Board's lost profits:

> [Bare Board's] expert conceded that—in reliance on counsel's instructions—he made no investigation of the facts to determine the existence of a link between the [Defendants'] conduct and the claimed lost profits. At the very least, the expert's disregard of the issue of causation renders his conclusions about [Bare Board's] lost profits suspect.[63]

For the same reason, this Court too finds Mr. Oscher's opinion suspect. Mr. Oscher has suggested that he really did investigate causation but that he just didn't testify about it during the state court trial. That seemingly contradicts the Second DCA's description of his testimony. But even assuming the Second DCA mischaracterized his testimony, which seems unlikely, this Court still is not persuaded Mr. Oscher meaningfully investigated whether Coghlan and del Grosso had relationships with any of the forty-two customers included in his analysis,

---

[61] 10/23/17 Trial Tr., p. 149, l. 22 – p. 150, l. 2; p. 155, l. 23 – p. 156, l. 11.

[62] 10/24/17 Trial Tr., p. 36, l. 19 – p. 38, l. 5.

[63] *ICMfg & Associates, Inc. v. Bare Board Group, Inc.*, 2017 WL 1040742, at *1 (Fla. 2d DCA March 17, 2017).

whether those relationships had any impact on the decisions of those forty-two customers to do business with the Debtor, and whether those relationships would have outweighed other factors such as price, quality, and lead times.

*Mr. Oscher's opinion on causation simply was not credible.*

To be sure, Mr. Oscher's failure to link the $3.1 million in lost profits to the Defendants' wrongful conduct is damning. So too is his failure to base his opinion on specific facts and data. But even accepting that Mr. Oscher based his opinion on specific facts and linked all $3.1 million in lost profits to wrongful conduct, Mr. Oscher's opinion still wasn't persuasive for another, more fundamental reason: It simply wasn't credible.

In Mr. Oscher's view, the primary reason customers chose to do business with the Debtor was because of their relationship with Coghlan and del Grosso.[64] Was price a factor? How about quality? Lead times? One-by-one, Mr. Oscher eliminated each of those factors as being more important than the relationships customers had with Coghlan and del Grosso—assuming they had any at all.[65] Not only does that defy common sense, it is contrary to the evidence at trial.

Perhaps the best example is Prime Technologies. Measured by total amount of lost profits, Prime Technologies was the largest customer on Mr. Oscher's list at

---

[64] 10/23/17 Trial Tr., p. 155, ll. 15 – 22; 10/24/17 Trial Tr., p. 14, ll. 4 – 11; p. 16, ll. 13 – 25; p. 66, l. 11 – 67, l. 8; p. 106, ll. 17 – 25.

[65] 10/24/17 Trial Tr., p. 134, l. 16 – p. 135, l. 6.

$639,783 in lost profits (on more than $4.7 million in sales).[66] Mark Haefner, the sales representative for Prime Technologies, testified that he was responsible for bringing Prime Technologies' business to the Debtor in August 2012, after Coghlan left Bare Board.[67] It seems doubtful Coghlan had any relationship with Prime Technologies since the company had only done $999 in sales with Bare Board ever— and that was in 2008.[68]

But in any event, Mr. Haefner testified that neither he nor anyone else from Prime Technologies—which accounts for more than twenty percent of Bare Board's lost profits claim—had any knowledge of Coghlan before meeting him in 2012 when he was an employee of the Debtor.[69] Prime Technologies' relationship with Coghlan couldn't have been a factor—much less the primary one—in the company doing business with the Debtor because Prime Technologies didn't have a relationship with Coghlan.

Another customer, S&Y Industries, testified that although it is still doing business with Bare Board, it is doing much less because of pricing.[70] Dan Faust, S&Y Industries' Vice President, testified that his company routinely seeks quotes from

---

[66] Bare Board Ex. 87; 10/24/17 Trial Tr., p. 61, l. 18 – p. 62, l. 25.

[67] 10/25/17 Trial Tr., p. 39, l. 10 – p. 41, l. 3.

[68] Bare Board Ex. 90.

[69] 10/25/17 Trial Tr., p. 41, l. 7 – p. 44, l. 12.

[70] *Id.* at p. 23, l. 16 – p. 24, l. 5; Bare Board Ex. 98.

multiple PCB distributors.[71] And it chooses which quote to go with based on price and lead time.[72] In 2012, Mr. Faust informed Bare Board that its business with Bare Board had dipped between 2010 and 2012 primarily because of pricing.[73]

S&Y Industries took the business it was giving to Bare Board and gave it to a company called E-TekNet—not the Debtor.[74] According to Mr. Faust, E-TekNet had "slash[ed] prices big time" and was "a killer on price."[75] In fact, switching from Bare Board to E-TekNet saved S&Y Industries a "ton" of money.[76]

S&Y industries does do business with the Debtor. Mr. Faust said S&Y Industries started buying boards from the Debtor because the Debtor could meet its price point.[77] If the Debtor wins on price, it will get business from S&Y Industries; if not, someone else will.[78] Ironically, though, the first time S&Y Industries learned of the Debtor was when Bare Board informed S&Y Industries that Coghlan (and Mike Doyle) had gone to the Debtor.[79] So for S&Y Industries, the primary reason for

---

[71] 10/25/17 Trial Tr., p. 16, l. 20 – p. 18, l. 24.

[72] *Id.* at p. 18, ll. 1 – 4.

[73] *Id.* at p. 23, l. 16 – p. 24, l. 5; Bare Board Ex. 98.

[74] 10/25/17 Trial Tr., p. 27, l. 1- p. 28, l. 10.

[75] *Id.*

[76] *Id.* at p. 27, l. 23 – p. 28, l. 10.

[77] *Id.* at p. 27, ll. 1 – 5.

[78] *Id.* at p. 29, ll. 14 – 24.

[79] *Id.* at p. 19, ll. 14 – 20; Bare Board Ex. 98.

doing business with the Debtor was pricing—not a relationship with Coghlan or del Grosso.

A third customer—Salem Technologies—confirmed that Mr. Coghlan had nothing to do with the reason it stopped buying printed circuit boards from Bare Board. Salem Technologies had been buying printed circuit boards from Bare Board in 2009 for a big project it had been working on.[80] But it started experiencing some quality issues.[81] So it moved its business for that project to Active Sales.[82] Once it switched vendors, Salem Technologies found that Active Sales' quality was "a good bit better" and that its pricing was almost half.[83] At that point, Salem Technologies didn't see any need to continue getting quotes from Bare Board.[84] Chris Tribble, Salem Technologies' principal, was unequivocal that Coghlan didn't affect his decision to stop buying from Bare Board and that the business Bare Board lost didn't go to the Debtor.[85]

Not only did the evidence at trial belie Mr. Oscher's opinion, but there was scant evidence to support it. No one testified, for instance, that the relationship with the inside sales person at a PCB distributor is the primary reason for doing business

---

[80] 10/25/17 Trial Tr., p. 89, ll. 10 – 17.

[81] *Id.* at p. 89, ll. 18 – 25; p. 92, ll. 12 – 14.

[82] *Id.* at p. 103, l. 2 – p. 104, l. 8.

[83] *Id.* at p. 104, ll. 9 – 24.

[84] *Id.*

[85] *Id.* at p. 90, l. 17 – p. 91, l. 21; p. 95, ll. 4 – 14; p. 97, ll. 3 – 5.

with the PCB distributor. More important, none of the forty-two customers on Mr. Oscher's list testified that they started doing business with the Debtor because of their relationship with Coghlan and del Grosso.

That is not to say that Bare Board was required to put on proof that all forty-two customers did business with the Debtor because of Coghlan and del Gross. In its written closing, Bare Board argues that the Eleventh Circuit's decision in *Nebula Glass International, Inc. v. Reichhold, Inc.* stands for the proposition that a plaintiff can rely on circumstantial evidence to prove lost profits and need not put on evidence for each customer.[86] But this case is distinguishable from *Nebula*.

In *Nebula*, the plaintiff (Glasslam) manufactured an impact-resistant laminated glass product called Safety Plus 1 using resin supplied by the defendant (Reichhold).[87] At some point, Glasslam discovered Reichhold's resin was defective.[88] So Glasslam sued for breach of contract, breach of express and implied warranty, breach of the implied warranty of fitness, and fraud.[89] At trial in that case, two customers testified they stopped buying glass from Glasslam after experiencing problems caused by Reichhold's defective resin.[90]

---

[86] Doc. No. 108 at 9 (citing *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203 (11th Cir. 2006)).

[87] *Nebula Glass*, 454 F.3d at 1206.

[88] *Id.*

[89] *Id.*

[90] *Id.* at 1209.

Glasslam also offered evidence at trial that its sales had skyrocketed after Safety Plus 1 hit the market, only to plummet to almost zero after word spread about the defective resin.[91] Ultimately, the jury awarded Glasslam $6.5 million in lost profits, and Reichhold appealed, arguing that Glasslam failed to offer sufficient evidence that its defective resin caused its lost profits.[92]

On appeal, the Eleventh Circuit upheld the lost profits award.[93] The direct evidence of at least some customers who stopped buying from Glasslam because of the problems caused by Reichhold's defective resin was central to the Eleventh Circuit's holding:

> Glasslam's case for future profits *rests on the inferences that one may reasonably draw from direct evidence that some customers refrained from buying Safety Plus I after the defects became known*, coupled with the demonstrable fact that its profits were trending sharply upward for the three years before resin problems surfaced, and plunged sharply at precisely the time when the defects became known in the relevant community.[94]

Here, unlike in *Nebula*, there was no *direct* evidence that Coghlan or del Grosso transferred their customer relationships to the Debtor. No customer, for instance, testified that it started doing business with the Debtor, even in part, because Coghlan or del Grosso had moved over to the new company. And there is little to no

---

[91] *Id.*

[92] *Id.* at 1207.

[93] *Id.* at 1213 – 17.

[94] *Id.* at 1216.

evidence that Bare Board's customers generally knew that Coghlan and del Grosso had any involvement with the Debtor. The closest Bare Board came to presenting direct evidence of causation were various e-mail exchanges in which it is clear Coghlan (sometimes under a pseudonym) is involved in bidding work for Static Control and Tyco on behalf of both Bare Board and the Debtor.

To be clear, those e-mails are direct evidence that Coghlan *breached* his fiduciary duty. But liability has already been established. So the Court takes for granted that Coghlan breached his fiduciary duty. The question is whether those e-mail exchanges are direct evidence that Coghlan's breach caused Bare Board to lose business it would have otherwise gotten.

To say Mr. Oscher's testimony on that point was underwhelming would be an understatement:

> Q:    Okay. And how were Mr. Coghlan and Ms. Del Grosso involved in sales to Static Control?
>
> A:    They had a relationship, as I understood it, using their connections with Static Control, and sales were made.
>
> *** *** ***
>
> Q:    What did you understand that happened regarding [Bare Board's] consignment program with Tyco?
>
> A:    Whatever the program that existed, it was transferred over to [the Debtor].
>
> Q:    And is that based on your review of the documents?
>
> A:    Yes, ma'am.

Q:     And from what documents did you conclude that
       the consignment program was transferred from
       [Bare Board] to [the Debtor].

A:     Well, there had been some emails that I'd been
       shown, where they were talking about that transfer.

Q:     How was Mr. Coghlan involved in the transfer of
       the business from [Bare Board] to [the Debtor]?

A:     Mr. Coghlan was, for all intents and purposes, the
       key individual with regards to the relationship with
       these customers and the relationship with the sales
       people.

*** *** ***

Q:     Okay. And how did – explain this e-mail for the
       Court.

A:     It's an email where there was a cancellation of sales
       that I understood had previously been made by
       [Bare Board] that were subsequently transferred to
       [the Debtor].

Q:     And how was Mr. Coghlan involved in the transfer
       of the purchase orders from [Bare Board] to [the
       Debtor].

A:     I think he'd been in the background.

Q:     Did you review documents showing that he was
       involved in the transfer of the purchase order.

A:     I think there were emails that were making
       reference to his involvement early on.[95]

Nowhere does Mr. Oscher point to any specific thing Coghlan did that caused Bare

Board to lose business.

---

[95] 10/23/17 Trial Tr., p. 157, ll. 18 – 21; p. 161, ll. 4 – 18; p. 161, l. 24 – p. 162, l. 9.

It is evident from his testimony that Mr. Oscher simply inferred Coghlan and del Grosso caused Bare Board to lose business with Static Control, Tyco, and General Microcircuits. Initially, he inferred that Bare Board would have gotten the business from those customers because it had supplied those customers with boards in the past. Then he inferred that the primary reason those customers bought printed circuit boards from the Debtor was because of Coghlan since (1) Coghlan was involved in quoting the business; and (2) the customers ultimately placed orders with the Debtor. While that is circumstantial evidence of causation, it certainly is not the type of direct evidence that supported the lost profit award in *Nebula*.

This case also differs from *Nebula* in another meaningful respect. In *Nebula*, the direct evidence of causation was coupled with circumstantial evidence that Glasslam's profits had skyrocketed after its Safety Plus 1 product hit the market, only to plummet after word spread about the defective resin.[96] Here, the circumstantial evidence of declining sales (and hence lost profits) is, to say the least, far from compelling.

Of the forty-two customers included in Mr. Oscher's lost profits, seventeen customers either had no noticeable change in their sales or actually increased their sales with Bare Board after the Debtor began competing.[97] Take ADI American Distributors, for example. In the two years before the Debtor began competing with

---

[96] 454 F.3d at 1209.

[97] Bare Board Ex. 90.

Bare Board, ADI American did about $30,000 in sales with Bare Board.[98] In the seven years since the Debtor started competing, ADI American bought more than $315,000 in boards from Bare Board—basically tripling its business with Bare Board.[99] Whereas ADI American bought $315,000 in printed circuit boards from Bare Board, during that same period it only bought around $40,000 in printed circuit boards from the Debtor.[100]

Another example is Syncro Corporation. Although the Debtor started competing in 2010, Syncro didn't buy printed boards from the Debtor until 2012, after Coghlan left Bare Board. And then it bought just under $7,500 in printed circuit boards.[101] Over the next four years, it bought around $170,000 worth of printed circuit boards.[102] By comparison, Syncro didn't buy any printed circuit boards from Bare Board in the two years before the Debtor opened or the two years after.[103] But between 2012 and 2016, Syncro bought nearly $1 million in printed circuit boards from Bare Board—up from $0 before the Debtor started competing (and more than five times the Debtor's sales over basically the same period).[104]

---

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] *Id.*

There was evidence that the amount of sales Bare Board did with some customers dropped dramatically after the Debtor started doing business. But in some cases, that had nothing to do with the Debtor. For instance, Bare Board's sales to Pacific Insight averaged around $1.2 million per year from 2008 to 2012, only to drop to less than $1 million in total over the next four years.[105] How much did Pacific Insight do in sales with the Debtor between 2010 and 2016? A total of $700.[106] In only a handful of cases, most notably Static Control and Tyco, was a dramatic decrease in sales by Bare Board accompanied by a dramatic increase in sales by the Debtor.

But in the case of Static Control, there was another explanation for Bare Board losing sales: pricing. Jay Helms, a Bare Board outside sales representative, testified several of his customers, including Static Control, were having trouble with Bare Board's pricing.[107] Helms was afraid he was going to lose Static Control.[108] In fact, he says Static Control was set to find another PCB distributor.[109] That's when Carl Moehring, another Bare Board outside sales representative, suggested Helms

---

[105] *Id.*

[106] *Id.*

[107] Bare Board Ex. 127, p. 15, l. 14 – p. 18, l. 22.

[108] *Id.*

[109] *Id.*

contact the Debtor.[110] At the time Moehring suggested that Helms contact the Debtor, Helms had not heard of the Debtor.[111]

Is it possible Coghlan took advantage of Static Control's pricing concerns? Sure. What if Coghlan artificially kept Bare Board's pricing high, intending all along to bid on behalf of the Debtor? Or what if Coghlan knew Bare Board's pricing was too high to be competitive, but he decided not to make any effort to see if the company could somehow lower its quote to keep the business because he knew the Debtor was bidding, too? In either case, that would be direct evidence of causation. Absent direct evidence (or more compelling circumstantial evidence), it's mere speculation or conjecture that the Defendants caused Bare Board to lose Static Control's business.

The same is true of Tyco. Bare Board makes much of this lucrative consignment program that the Debtor ended up with. Bare Board says that Coghlan rejected an opportunity to do the consignment program with Tyco.[112] But Coghlan's initial reaction to the proposal was that he would be "very agreeable" to a consignment arrangement.[113] The sole evidence that he rejected the consignment program was testimony that Bare Board received a proposed consignment agreement

---

[110] *Id.*

[111] *Id.*

[112] Bare Board Ex. 18; Bare Board Ex. 127, p. 136, ll. 5 – 25; Bare Board Ex. 119, p. 166, l. 11 – p. 167, l. 6.

[113] Bare Board Ex. 18.

from Tyco, after Coghlan said he was "very agreeable," but that Coghlan marked up some provisions that weren't favorable and sent it back to Tyco, where it ultimately fizzled.[114]

Is it possible Coghlan torpedoed the proposed consignment agreement for Bare Board by arbitrarily rejecting proposed contract provisions knowing the Debtor would propose a consignment relationship? It's possible, although there's no evidence that was the case. It's also possible his comments to the proposed contract were perfectly reasonable. Once again, it's mere speculation or conjecture.

In the end, that's what Bare Board's causation argument boils down to: mere speculation or conjecture. In *Nebula*, the Eleventh Circuit held that direct evidence of two customers refusing to do business with Glasslam because of the defendant's wrongful conduct, coupled with circumstantial evidence of declining sales, was sufficient to sustain a lost profits award in that case. But that doesn't mean that evidence will be sufficient in every case. In this case, the Court concludes that whatever direct evidence there was (if there was any at all), coupled with the circumstantial evidence, was not sufficient to satisfy the mind of a prudent impartial person that the damages are not the result of speculation or conjecture.

### Bare Board failed to prove a reasonable yardstick for adequately measuring lost profits.

Even if Bare Board had proved causation, the Court would still decline to award lost profits. It is true that Bare Board need not prove its lost profits with

---

[114] Bare Board Ex. 127, p. 136, ll. 5 – 25.

precision. "[U]ncertainty as to the precise amount of lost profits will not defeat recovery so long as there is a reasonable yardstick by which to estimate the damages."[115]

Bare Board failed to prove a reasonable yardstick for two reasons. First, although Mr. Oscher claimed to have applied the "before and after" method, in actuality Bare Board seeks disgorgement. Disgorgement is not an appropriate yardstick in this case. Second, Mr. Oscher failed to provide a fixed standard for measuring lost profits. So Bare Board would not be entitled to lost profits even if it could prove causation.

*Disgorgement is not an appropriate yardstick.*

Mr. Oscher claims he used the "before and after" method for calculating Bare Board's lost profits.[116] The "before and after" method is commonly used to prove lost profits.[117] The "before and after" method compares a plaintiff's record of profits before the defendant's wrongful conduct with the plaintiff's record of profits after the wrongful conduct.[118] That is not what Mr. Oscher did here.

He didn't compare Bare Board's record of profits before Coghlan and del Grosso diverted business to the Debtor with the record of profits after business was

---

[115] *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1217 (11th Cir. 2006).

[116] 10/23/17 Trial Tr., p. 154, ll. 12 – 15.

[117] *Pleasant Valley Biofuels, LLC v. Sanchez-Medina*, 2014 WL 2855062, at *7 (S.D. Fla. June 23, 2014).

[118] *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974); *Moon v. Med. Tech. Assocs., Inc.*, 2015 WL 1227499, at *2 (M.D. Fla. March 17, 2015) (citing *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974)).

diverted. Rather, he simply looked to see which customers the Debtor sold to. If any of those customers previously did business with Bare Board, then Mr. Oscher ascribed all profits from sales to that customer to Bare Board.[119] In reality, Mr. Oscher's "before and after method" is really just disgorgement dressed up under a different name.

To prove the point, the main case Bare Board cites as providing a yardstick for determining lost profits is the Northern District of California's decision two years ago in *AngioScore, Inc. v. TriReme, Inc.*[120] In that case, Eitan Konstantino, an AngioScore director, developed an angioplasty balloon catheter similar to the one that AngioScore manufactured and marketed.[121] Not only did Konstantino know his catheter would compete with AngioScore's catheter, that was his intent.[122] After determining that Konstantino usurped a corporate opportunity, the trial court awarded AngioScore eight years of lost profits, in part, because the damages award was required to "be commensurate with the highest degree of opprobrium for [Konstantino's] wrongful conduct."[123] This Court rejects the *AngioScore* analogy for two reasons.

---

[119] 10/23/17 Trial Tr., p. 150, l. 25 – p. 152, l. 11; p. 155, ll. 7 – 10.

[120] 2015 WL 4040388 (N.D. Cal. July 1, 2015).

[121] *Id.* at * 2 – 3.

[122] *Id.* at *3.

[123] *Id.* at *32.

First, unlike *AngioScore*, this isn't a corporate opportunity case. Had Bare Board limited its damages claims to Static Control and Tyco, the corporate opportunity analogy would be more apt. But surely Bare Board doesn't contend that every one of its customers—including eight who hadn't even bought printed circuit boards in the two years before the Debtor was formed and a ninth who only bought $999 in printed circuit boards—is a corporate opportunity. Second, the Second DCA has instructed this Court that any lost profits award must be "commensurate with what is fair and just and limited to the actual damages sustained"[124]—not "commensurate with the highest degree of opprobrium for . . . wrongful conduct."[125]

*Mr. Oscher's lost profits period is not a fixed standard of measurement.*

Even if the *AngioScore* analogy applied, the Court would still reject Mr. Oscher's opinion. Mr. Oscher opted to measure Bare Board's lost profits over a seven-year period.[126] At first, it appeared he chose seven years because that was the average length of time a customer did business with Bare Board.[127] As it turns out, that's just a coincidence. Mr. Oscher chose seven years because the Debtor only produced sales information through 2017. If, for some reason, trial had been twenty

---

[124] *ICMfg & Associates, Inc. v. Bare Board Group, Inc.*, 2017 WL 1040742, at *8 (Fla. 2d DCA March 17, 2017).

[125] *AngioScore*, 2015 WL 4040388, at *33.

[126] 10/24/17 Trial Tr., p. 12, ll. 4 – 19.

[127] 10/23/17 Trial Tr., p. 71, l. 16 – p. 72, l. 1.

years after the Debtor started competing, Mr. Oscher would have used twenty years as the loss period.[128]

That's not a yardstick—it's a retractable tape measure that Mr. Oscher can extend as far as he deems convenient. While Mr. Oscher only extended the lost profits tape measure seven years in this case, there was no testimony why that's a reasonable period. In fact, it's patently unreasonable under Bare Board's theory of the case.

Bare Board's corporate representative testified that the average customer did business with Bare Board for seven years.[129] All forty-two customers included in Mr. Oscher's analysis had been doing business with Bare Board for at least two years before the loss period.[130] Of course, each customer started doing business with Bare Board at different times. Some customers may have been doing business with Bare Board for seven years by the time the loss period started. But we know that all forty-two customers had been doing business with Bare Board as of 2008—two years before the loss period.[131]

So why isn't the loss period five years? After all, Bare Board could not have expected to do business with a particular customer beyond the seven-year average relationship. And at least two years had already passed. The answer is simple: the

---

[128] 10/24/17 Trial Tr., p. 52, l. 16 – p. 54, ll. 8 – 14.

[129] 10/23/17 Trial Tr., p. 71, l. 16 – p. 72, l. 1.

[130] Exs. 87 & 90.

[131] *Id.*

loss period is arbitrary. Had trial been pushed off another year, Mr. Oscher would have extended his loss period to eight years. An arbitrary loss period that can be extended at the expert's whim is not a reasonable yardstick for adequately determining lost profits.

## Conclusion

Bare Board has already recovered compensatory and punitive damages. Coghlan and del Grosso have each had to disgorge more than $1.4 million in salary and benefits for the time they were serving two masters. They were also assessed $100,000 in punitive damages each. But Bare Board has failed to prove it is entitled to any lost profits.

Bare Board put on circumstantial evidence that the Defendants caused its lost profits. That evidence, however, simply was not sufficient to satisfy a reasonably prudent and impartial person that the $3.1 million lost profits were not speculative or conjectural. Because Bare Board failed to meet its burden, it is not entitled to recover any lost profits.

The Court will enter a separate judgment consistent with these Findings of Fact and Conclusions of Law. In the meantime, these Findings of Fact and Conclusions of Law shall be a non-final order.


Attorney Susan Sharp is directed to serve a copy of these Findings of Fact and Conclusions of Law on interested parties who are non-CM/ECF users and file a proof of service within 3 days of entry of these Findings of Fact and Conclusions of Law.

**Susan H. Sharp, Esq.**
**Matthew B. Hale, Esq.**
  Stichter, Riedel, Blain & Postler
**Robert W. Hitchens, Esq.**
  Hitchens & Hitchens, P.A.
*Counsel for the Defendants*


**Charles M. Harris, Esq.**
**Kelly J. Ruoff, Esq.**
**Megan W. Murray, Esq.**
  Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.
*Counsel for the Plaintiff*